[Civ. No. 21307. First Dist., Div. Two. Mar. 17, 1964.]

ALBERT MULDER et al., Plaintiffs and Respondents, v. MENDO WOOD PRODUCTS, INC. et al., Defendants and Appellants.

622

Timothy W. O'Brien, James F. Kemp, Casey & Palmer and John F. Casey for Defendants and Appellants.

Thomas F. Cleland for Plaintiffs and Respondents.

SHOEMAKER, P. J.—This is an action by three former employees of defendant Mendo Wood Products, Inc., to recover wages allegedly due them under the Fair Labor Standards Act of 1938 (29 U.S.C.A. § 201 et seq.). The complaint alleged that plaintiffs Albert Mulder, Albert Woodall, and Robert Riddle, were each employed as truck drivers by the defendant for specified periods during the years 1959 and 1960; that each of the plaintiffs worked a considerable number of hours in excess of 40 hours per week; that at the times such employment was performed, defendant was subject to the provisions of the Fair Labor Standards Act and was required to pay plaintiffs time-and-a-half for their hours of overtime; that defendant had in fact paid plaintiffs only straight time and that they were therefore entitled to recover

the difference between time-and-a-half and straight time for the hours of overtime worked, liquidated damages in an equal amount, and attorney's fees. In addition, plaintiff Riddle alleged that during the years 1959 and 1960, he had worked a number of hours in the defendant's employ for which he had received no pay whatever. He sought straight wages for the hours so worked, liquidated damages in an equal amount, and attorney's fees.

The defendant answered, admitting that it was subject to the Fair Labor Standards Act at the times mentioned in the complaint, and that it had employed plaintiffs as truck drivers during the periods alleged. As an affirmative defense to each cause of action, defendant alleged that it was a private carrier of property by motor vehicle within the meaning of part II of the Interstate Commerce Act (49 U.S.C.A. § 301 et seq.); that plaintiffs were employees with respect to whom the Interstate Commerce Commission had the power to establish qualifications and maximum hours of service pursuant to said act; and that plaintiffs were accordingly exempted from the maximum hours and overtime provisions of the Fair Labor Standards Act by section 13, subdivision (b) (1), of said act (29 U.S.C.A. § 213(b)(1)).

The evidence established that defendant was a California corporation engaged in the manufacture and sale of studs, and that its principal place of business was located at the Ridgewood Ranch in Ukiah, California. In order to deliver its studs to purchasers, the defendant used trucks which it leased from other companies and which were operated by drivers in its own employ. Plaintiff Mulder was employed by the defendant as a truck driver during the period from January 1, 1959, through September 15, 1960; plaintiff Woodall, during the period from January 1, 1959, through July 15, 1960; and plaintiff Riddle, during the period from January 1, 1959, through August 15, 1960. Time cards covering the periods in question showed that each of the plaintiffs had worked a substantial number of hours in excess of 40 hours per week, for which they were paid only straight time. Computations based upon these time cards demonstrated that the difference between straight time and time-and-a-half pay for the total number of overtime hours worked came to $2,222.90 in the case of plaintiff Mulder; $2,240.33 in the case of plaintiff Woodall; and $1,885.77 in the case of plaintiff Riddle. In addition, plaintiff Riddle, during the period from May 1, 1959, through July 31, 1960, spent 216 hours attending his

truck during breakdowns on the road and received no compensation whatever for this time. Straight time pay during the period in question was $2.37 per hour.

The evidence relative to the interstate character of defendant's trucking operations revealed that in the year 1958, defendant's drivers did transport shipments of studs to various out-of-state destinations. It was conceded by the defendant, however, that no out-of-state deliveries were made during 1959 or 1960. The testimony pertaining to the defendant's reason for discontinuing these deliveries was somewhat conflicting. Elwood Welch, the secretary of defendant corporation, testified that there had been no change of company policy commencing in the year 1959, and that the defendant was at all times willing to sell and deliver its studs to both in-state and out-of-state buyers. Plaintiff Mulder testified, however, that there had been a definite change in delivery procedures subsequent to 1958 and that the defendant henceforth arranged to have its out-of-state buyers come to the Ridgewood Ranch and pick up the studs ordered in their own trucks. He also testified that the defendant did not have either an Interstate Commerce Commission permit or Interstate Commerce Commission plates for its trucks.

In any event, all of the hauls made by defendant's drivers during the years 1959 and 1960 were between two points within the State of California. In the majority of cases, the drivers would pick up studs at the Ridgewood Ranch and deliver them to various tracts under construction and to retail or wholesale lumber dealers. Although the defendant introduced evidence to the effect that certain of these wholesale dealers ultimately shipped some of the defendant's studs to out-of-state retail buyers, there was no evidence that such shipments were part of any continuous out-of-state movement commencing at the Ridgewood Ranch. To the contrary, plaintiff Mulder testified that the bills of lading or waybills showed the ultimate destination of the loads delivered by defendant's drivers to be the lumber yard of the particular California wholesaler. Mr. Welch himself confirmed this testimony, and stated that the defendant's duties with regard to its studs ceased upon delivery to an in-state wholesale customer, that the defendant did not undertake to tell its wholesale customers what to do with the studs, and that any further shipment of the studs was dictated by the wholesaler's own requirements and by orders which it might receive from its own out-of-state customers.

In addition to the intrastate shipments to tracts and to retail and wholesale lumber dealers, there was also evidence that the defendant's drivers were occasionally required to haul studs, by way of private road, from the defendant's stud mill to a railroad siding also located on the Ridgewood Ranch, where the studs were loaded on cars and shipped to various out-of-state destinations. The total distance from the mill to the siding was some 1½ to 2 miles.

There was also evidence that sometime during 1959, defendant's drivers delivered the component parts for a feed mill from the Miller Manufacturing Company in Modesto, California, to the Ridgewood Ranch, and that certain of these parts had been manufactured in other states. The feed mill machinery had been ordered by Welch & Welch, a partnership, whose principal place of business was also located at the Ridgewood Ranch and whose members were identical with the shareholders of defendant corporation. Mr. Welch testified that the two companies frequently exchanged equipment and labor and that defendant corporation had provided the trucks and drivers to pick up and deliver the feed mill parts ordered by Welch & Welch. Mr. Thompson, the president and general manager of the Miller Manufacturing Company, testified that Welch & Welch had ordered the parts for the feed mill from his company, that certain of the parts had been manufactured by his company in Modesto and other parts had been ordered from out-of-state manufacturers. Mr. Thompson also testified that certain of the parts manufactured outside the state had been purchased by his company from dealers within the state, and that other parts which had been ordered directly from out-of-state sources were stored by his company for some five or six months before being sold to a particular in-state customer.

Upon this evidence, the trial court found that during the years 1959 and 1960, the defendant was subject to the provisions of the Fair Labor Standards Act and had employed plaintiffs as truck drivers; that at various times during these years, plaintiffs had worked in excess of 40 hours per week; that although plaintiffs were entitled to time-and-a-half for the hours so worked, defendant paid them only straight time; that plaintiff Mulder was entitled to unpaid wages in the amount of $2,220.90, plaintiff Woodall to unpaid wages in the amount of $2,240.03, and plaintiff Riddle to unpaid wages in the amount of $1,885.77; that defendant's refusal to pay the amounts due had necessitated the bringing of the

instant action and that $500 was a reasonable amount to allow each plaintiff for attorney's fees; that plaintiffs were also entitled to liquidated damages in the amount of their unpaid wages. The court also found that plaintiff Riddle had worked 216 hours for which he received no pay whatever, that his wages at that time were $2.37 per hour, and that he was entitled to recover the sum of $511.92. Judgment was accordingly entered and defendant appealed therefrom.[1]

Appellant first contends that its trucking operations were exempt from the wage and hour provisions of the Fair Labor Standards Act by virtue of section 13, subdivision (b)(1), of said act (29 U.S.C.A. § 213(b)(1)), which provides in relevant part that "The provisions of section 207 of this title shall not apply with respect to . . . any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of title 49. . . ."

Section 304, subdivision (a)(3) of title 49 (49 U.S.C.A. § 304(a)(3)), provides that "It shall be the duty of the Commission . . . [t]o establish for private carriers of property by motor vehicles, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment." Pursuant to section 303, subdivision (a)(17) (49 U.S.C.A. § 303(a)(17)), ". . . [t]he term 'private carrier of property by motor vehicle' means any person . . . who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise." Pursuant to section 303, subdivision (a)(13) (49 U.S.C.A. § 303(a)(13)), ". . . [t]he term 'motor vehicle' means any vehicle . . . used upon the highways in the transportation of passengers or property. . . . " Section 303, subdivision (a)(12) (49 U.S.C.A. § 303(a)(12)), provides that ". . . [t]he term 'highway' means the roads, highways, streets, and ways in any State."

■ The application of the exemption set forth in section 13, subdivision (b)(1) of the Fair Labor Standards Act is determined solely by the existence of power to regulate in the

---

[1]Although the notice of appeal actually provided that "defendants Mendo Wood Products, Inc., E. C. Welch and J. D. Welch, Jr., hereby appeal . . . from said judgment," the latter two individuals appear to have abandoned their appeal and have filed no briefs with this court.

Interstate Commerce Commission and it is not necessary for the commission to have exercised this power and actually established qualifications and maximum hours of service. (*Levinson* v. *Spector Motor Co.* (1947) 330 U. S. 649, 661 [67 S.Ct. 931, 91 L.Ed. 1158].)

Appellant asserts that it clearly qualified as a "private carrier of property by motor vehicle" subject to the commission's power to regulate because the interstate character of its operations was conclusively established by evidence that (1) appellant's trucks were driven to out-of-state destinations prior to 1959 and no change in company policy occurred in 1959; (2) appellant's trucks delivered studs to wholesale lumber dealers who subsequently "transhipped" these studs to out-of-state destinations without reprocessing; (3) appellant's trucks carried machinery from the Miller Manufacturing Company in Modesto to the Ridgewood Ranch, and certain of this machinery was ordered from out-of-state manufacturers; and (4) appellant's trucks carried studs to railroad sidings, where such studs were loaded and shipped to out-of-state destinations.

Taking these contentions in order, it is apparent that the testimony pertaining to the presence or absence of a change in company policy regarding out-of-state deliveries presented a question of fact for the trial court. Although appellant's secretary testified that no such change occurred, there was evidence that appellant had arranged to have its out-of-state buyers pick up their studs at appellant's mill at all times subsequent to 1958 and that appellant made no single out-of-state delivery during 1959 and 1960. Under such circumstances, it clearly cannot be said that the evidence was insufficient as a matter of law to support a finding that there had been a change in company policy and that appellant had deliberately discontinued its out-of-state deliveries after 1958.

The evidence that appellant delivered its products to California wholesalers, some of whom ultimately reshipped the products out of state, similarly does not suffice to render appellant a private carrier subject to the regulatory powers of the Interstate Commerce Commission. Since the evidence clearly indicated that appellant had no further interest in its studs following sale and delivery to California wholesalers, it is apparent that appellant did not participate in any continuous movement of products into interstate commerce. In *Dallum* v. *Farmers Co-Operative Trucking Assn.* (D.C.Minn. 1942) 46 F.Supp. 785, the court held that but-

ter which was delivered to a distributing center and stored until such time as it could be transported to customers was not in interstate commerce until such time as it left the distributing center enroute to out-of-state customers. Although the butter was transported to the distributing center with knowledge that it might eventually be shipped out of state, no further movement of the butter to any particular person was contemplated and delivery was dependent upon the demands of customers. The court stated, "Mere intention by the owner to place goods in interstate commerce, or the gathering of goods at a depot for that purpose, is not sufficient. It must appear that the goods have entered upon transportation to another state before it can be said that they are in interstate commerce." (Pp. 787-788.)

In the present case, the record is devoid of any evidence that appellant's studs were already destined for a particular out-of-state customer at the time they left the Ridgewood Ranch. The evidence establishes, to the contrary, that appellant sold its studs only to California wholesalers and that it had no foreknowledge of the fact that certain of its studs might ultimately be shipped out of state.

■ Appellant's delivery of feed mill parts to the Ridgewood Ranch presents the converse situation. The evidence reveals that the machinery in question was ordered by Welch & Welch from the Miller Manufacturing Company in Modesto, California. Although it is true that certain of these parts were ordered by the Miller Manufacturing Company from out-of-state sources, there is no indication in the record that either Welch & Welch or appellant and its drivers were aware of this fact. In addition, there was evidence to the effect that certain of the parts which had been manufactured out of state were either obtained from California suppliers or were retained in the warehouse of the Miller Manufacturing Company for several months prior to their delivery to the Ridgewood Ranch. Under such circumstances, we believe the trial court would be justified in concluding that the parts in question were no longer in interstate transit when they were picked up by appellant's trucks. ■ Moreover, in our opinion an isolated incident of this nature is not sufficient to render appellant and its employees subject to the regulatory powers of the Interstate Commerce Commission.

■ The deliveries to the local railroad siding on the Ridgewood Ranch appear to fall directly within the holding of *Henry W. Robertson Contract Carrier Application*

(1942) 34 I.C.C. Reports, Motor Carrier Cases, No. M.C. 96212. In that case, the applicant sought a permit authorizing his operation in interstate or foreign commerce as a contract carrier by motor vehicle. The evidence revealed that the applicant transported zinc and lead concentrates from the mine bins to cars at railroad sidings, where they were loaded and shipped to out-of-state points. The shipments from the mines to the sidings covered distances of not more than two miles and were entirely intrastate and over private rights of way. These shipments were made, however, with the intent to transport the concentrates in a continuous movement to out-of-state destinations. The commission nevertheless held that the applicant was not subject to its regulatory powers. In so holding, the commission pointed out that part II of the Interstate Commerce Act, from which it derived its powers, defined "motor vehicle" as "any vehicle ... used upon the highways ..." (see 49 U.S.C.A. § 303(a)(13)) and further defined "highway" as "the roads, highways, streets, and ways in any State" (see 49 U.S.C.A. § 303(a)(12)). Since the applicant shipped his goods only over private rights of way, he did not qualify as a contract carrier "by motor vehicle" within the meaning of the act.

In the instant case, appellant's drivers similarly made practically all of their trips to the railroad siding entirely over a private road on the Ridgewood Ranch, the only exception occurring when the load was of such an unusual size that it would not go through the underpass beneath Highway 101, at which time, for a short distance, the trucks would traverse said highway. It is also to be noted that said highway traversed the Ridgewood Ranch, the owner of the fee to the area over which the state enjoyed an easement for the purpose of the highway use.

Appellant strenuously argues that the trial court's method of computation fails to comply with the Fair Labor Standards Act and demands a reversal of the judgment on this ground alone. We have read the testimony and examined the exhibits offered on behalf of plaintiffs, and we find no support for such contention. The appellant ignores the fact that we are faced here not with persons working a set five-day week with an eight hour per day schedule of employment, but rather truck drivers who worked a seven-day week with only an occasional day off each month, if fortunate, and whose pay was based on an hourly rate requiring the truck to be moving, refueling, loading or unloading, the hours of pay

necessarily varying with the distance from the plant to the place of delivery. The trial court's adoption of plaintiffs' allowance of 80 or 88 hours for each pay period was more than fair to appellant, for we can readily see how by reason of breakdown of the equipment or other delays a driver could, during a seven-day week, only be entitled to straight time well below 40 hours and yet in the following week be so continuously occupied that his compensable time would run many hours beyond the straight time period of 40 hours, yet under the computation here used would sacrifice overtime hours to make up the deficit below the 40 hours in the previous week before setting the number of his compensable overtime hours. Such advantage enjoyed by the appellant furnishes no valid ground for complaint. If appellant wished a more detailed method of computation, it had its opportunity to develop the same, for it was from its records that the figures arrived at by the trial court were deduced.

Appellant next contends that the court erred in awarding respondents penalties in an amount equal to the unpaid overtime wages found to be due them. Appellant asserts that the record contains uncontroverted evidence that its failure to pay its employees time-and-a-half for overtime was due to its good faith belief that it was not subject to the wage and maximum hour provisions of the Fair Labor Standards Act. Under such circumstances, appellant contends that the award of penalties must be reversed.

Pursuant to section 207, subdivision (a)(1), of the Fair Labor Standards Act (29 U.S.C.A. § 207(a)(1)), "no employer shall employ any of his employees ... for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed. ..."

Section 216, subdivision (b) (29 U.S.C.A. § 216(b)) provides that "Any employer who violates the provisions of ... section 207 ... shall be liable to the employee or employees affected in the amount of ... their unpaid overtime compensation ... and in an additional equal amount as liquidated damages."

Section 260 of the Portal-To-Portal Act (29 U.S.C.A. § 260), upon which appellant relies, provides that "In any action commenced prior to or on or after May 14, 1947 to recover ... unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as

amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title.''

In order to escape payment of liquidated damages, pursuant to the section above quoted, the employer must sustain the plain and substantial burden of persuading the court by proof that his failure to obey the Fair Labor Standards Act was both in good faith and predicated upon such reasonable ground that it would be unfair to impose upon him more than a compensatory judgment. (*Wright* v. *Carrigg* (4th Cir. 1960) 275 F.2d 448.)

In the present case, appellant has failed to direct this court's attention to any testimony demonstrating that appellant had reasonable grounds for believing that it was not required to pay its employees the overtime compensation required under the Fair Labor Standards Act. Although appellant now asserts that it was under the belief that its interstate activities rendered it subject to part II of the Interstate Commerce Act and thereby exempted it from the wage and maximum hour provisions of the Fair Labor Standards Act, this contention is not borne out by the record, which reveals that appellant made no interstate truck shipments during the years 1959 and 1960, and that appellant never applied for or received an Interstate Commerce Commission permit or plates. The only testimony bearing directly upon appellant's good faith belief that it was exempt from the wage and maximum hour provisions of the Fair Labor Standards Act consisted of Mr. Welch's statement that he had always considered lumber ''an interstate article'' regardless of where it was shipped or what was done with it. Under such circumstances, it cannot be said that the court abused its discretion in awarding respondents liquidated damages.

Appellant's next contention is that there is no support in the evidence for respondent Riddle's award of $511.92 as compensation for the hours spent with his truck during breakdowns. We agree. An examination of the findings fails to reveal the precise basis for this award, since the findings, as above noted, merely state that respondent Riddle had worked a specified number of hours and was entitled to

recover wages therefor. The trial court's memorandum opinion, however, indicates that this award was predicated upon an implied contract theory whereby appellant employer impliedly agreed to pay his employees for all time spent on its behalf. Since the Fair Labor Standards Act contains no provisions specifically requiring the payment of "breakdown time," it would appear that this implied contract theory constitutes the only basis, if any, upon which the award could be upheld.

However, a thorough review of the record fails to disclose any evidence of such an implied contract. Respondent Riddle testified that he had never discussed payment for breakdown time with appellant, and that he had always been paid only for actual driving time, for fuel time, and for loading and unloading. He also stated that the trucks were equipped with clocks which recorded the hours during which the truck was in motion and which stopped when the truck was at rest. He stated that he was always paid for the time recorded on the disc and for any additional time spent in fueling, loading and unloading; that he never asked appellant to pay him for his breakdown time; and that he continued to work for appellant knowing that he would receive no compensation for this time.

In view of this evidence, there is no justification for the award of breakdown time to respondent Riddle. Civil Code, section 1620, states that "An express contract is one, the terms of which are stated in words." Civil Code, section 1621, provides that "An implied contract is one, the existence and terms of which are manifested by conduct." It is settled that both types of contract are identical in that they require a meeting of the minds or an agreement. (*Desny* v. *Wilder* (1956) 46 Cal.2d 715, 735 [299 P.2d 257].) The true implied contract consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words. (*Silva* v. *Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773 [97 P.2d 798].)

In the instant case, there is a complete absence of any evidence indicating that appellant and respondent Riddle ever arrived at an agreement that appellant would pay respondent Riddle for his breakdown time. To the contrary, the evidence is strongly indicative of an implied agreement that no such compensation would be paid. Under such circumstances, the award of $511.92 to respondent Riddle may not be upheld.

Appellant next contends that the trial court failed to make findings of fact on all material issues raised by the pleadings and evidence. Appellant asserts, more specifically, that the trial court failed to make any finding that appellant was not exempt from the overtime provisions of the Fair Labor Standards Act; that the court failed to find the number of hours worked by each respondent in excess of 40 hours per week; and that the court failed to find whether appellant acted in good faith in failing to pay respondents time-and-a-half for the overtime hours worked.

 The findings that appellant was subject to the Fair Labor Standards Act during the years 1959 and 1960 and that respondents were entitled to recover time-and-a-half pay and liquidated damages for the overtime hours worked negate by necessary inference appellant's claim that it was exempt from the wage and hour provisions of the Fair Labor Standards Act. (*Kux* v. *Cal-West Lumber Corp.* (1958) 162 Cal.App.2d 500, 505 [328 P.2d 240]; *Petersen* v. *Murphy* (1943) 59 Cal.App.2d 528, 534 [139 P.2d 49].) Since the court found the total amount of overtime pay due each respondent and since such findings are statements of ultimate fact (*Nisbet* v. *Rhinehart* (1935) 2 Cal.2d 477, 482 [42 P.2d 71]), the court was not required to make additional findings relative to evidentiary matters such as the number of overtime hours worked by each respondent. (*People* v. *Hecker* (1960) 179 Cal.App.2d 823, 832 [4 Cal.Rptr. 334]; *Gross* v. *Needham* (1960) 184 Cal.App.2d 446, 463 [7 Cal.Rptr. 664].) A finding that appellant did not act in good faith when it failed to pay respondents the required overtime compensation would appear unnecessary in view of the finding that respondents were entitled to liquidated damages. (*Kux* v. *Cal-West Lumber Corp., supra; Petersen* v. *Murphy, supra.*) In any event, appellant did not plead the defense of good faith and offered no evidence pertaining thereto.

 Appellant's final contention is that the findings of fact, conclusions of law and judgment are unsupported by the evidence in two respects: (1) that respondents failed to prove the amount of overtime pay to which they were entitled, and (2) that the judgment was made to run against E. C. Welch and J. D. Welch, Jr., as well as against appellant. The first of these arguments is without merit, since, as above noted, respondents supported their wage claims by time cards covering their total periods of employment during 1959 and

1960 and by itemized computations based upon those time cards.

Appellant's second contention raises a more serious problem. An examination of the pleadings and pretrial conference order fails to disclose that the action was brought against any other defendant than appellant Mendo Wood Products, Inc. At the commencement of the trial, however, respondents' attorney suggested a stipulation to the effect that appellant Mendo Wood Products, Inc., was in the process of dissolution and that Jeff Welch and Elwood Welch had agreed that any judgment which might be entered in the action would be binding on them. Counsel for appellant stated that he had given counsel for respondents a written guarantee but that he had no authority to file it in the action. At a subsequent stage in the proceedings, the subject was again broached, and appellant's counsel reiterated that there was a guarantee, that respondents' counsel had a copy, that it covered any judgment that might be rendered in the within action, but went no further.

On December 21, 1962, judgment in favor of respondents was entered against appellant Mendo Wood Products, Inc. Notice of appeal from this judgment was filed on behalf of Mendo Wood Products, Inc., E. C. Welch and J. D. Welch, Jr. The latter two individuals, as above noted, took no further steps to perfect their appeal. On March 15, 1963, the court entered a new judgment in order to eliminate an award of interest which had inadvertently been inserted in the original judgment. The amended judgment ran against defendants ''Mendo Wood Products, Inc., E. C. Welch, and J. D. Welch, Jr.'' Although this judgment is not a part of the record in the instant appeal, it is this judgment which appellant Mendo Wood Products, Inc. now attacks on the ground that it was erroneously made to run against the Welches. It is settled that an appellant may not on his appeal urge errors which affect only his coparties who do not appeal, and that such errors can be reviewed only at the instance of the parties affected thereby. (*Estate of Nepogodin* (1955) 134 Cal.App.2d 161, 173 [285 P.2d 672]; *Broadway Federal etc. Loan Assn.* v. *Howard* (1955) 133 Cal.App.2d 382, 400 [285 P.2d 61].) Since the Welches chose to abandon their appeal, their rights cannot be asserted by appellant Mendo Wood Products, Inc., as a ground for reversal.

Respondents' motion to dismiss this appeal, on the ground that it was taken from a judgment which is nonappealable by

virtue of having been superseded by a new and different judgment, is denied.

In the present case, it is clear to us that the trial judge never intended the judgment to include an award of interest. It was by inadvertence that the judge signed this judgment, prepared by respondents' counsel, which awarded interest. Upon being brought to the court's attention, respondents immediately conceded the error and the matter was corrected.

It is settled that where the amendment merely corrects a clerical error and does not involve the exercise of judicial discretion, the original judgment remains effective and unimpaired and the amendment does not operate as a new judgment from which a new appeal may be taken. (*O'Connor* v. *Skelton* (1961) 195 Cal.App.2d 612, 614-615 [15 Cal.Rptr. 404]; *McConville* v. *Superior Court* (1926) 78 Cal.App. 203, 207 [248 P. 553]; *George* v. *Bekins Van & Storage Co.* (1948) 83 Cal.App.2d 478, 480-481 [189 P.2d 301].)

For the reasons above stated, the judgment is modified by reducing the amount of damages awarded respondent Riddle from $4,783.46 to $4,271.54, and as so modified, the judgment is affirmed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied April 16, 1964, and appellants' petition for a hearing by the Supreme Court was denied May 13, 1964. Schauer, J., was of the opinion that the petition should be granted.